**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>     **Plaintiff,**<br><br>  **-against-**<br><br>**CASEY MUGGLESTON,**<br><br>     **Defendant.** | **COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC"), alleges as follows against Defendant Casey Muggleston ("Muggleston" or "Defendant"):

**SUMMARY**

1. This action involves insider trading by Muggleston in the securities of Constellation Energy Corporation ("Constellation" or "the Company") based on material nonpublic information that he acquired while working for the Company.

2. In 2024, Muggleston was an engineering manager at Constellation. In that role, Muggleston had access to material nonpublic information, including information relating to Constellation's confidential project to potentially restart its nuclear power plant at Three Mile Island Unit 1 ("Three Mile Island" or "TMI"). Constellation referred to this project by the code name "Project Tetris."

3. Muggleston owed Constellation a duty not to disclose material nonpublic information that he acquired through his employment without a business purpose and to refrain from using that information to trade securities. Muggleston breached that duty and violated the federal securities laws when he used material nonpublic information about Project Tetris to trade

the Company's securities in advance of Constellation's September 20, 2024 announcement that it had entered into a 20-year power purchase agreement with Microsoft Corporation ("Microsoft") that would pave the way for Constellation to restart the Unit 1 reactor at Three Mile Island (the "Announcement").

4.    Muggleston's trades based on material nonpublic information resulted in him making unlawful profits of approximately $1,400,000.

5.    By engaging in the conduct described in this Complaint, Muggleston violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

6.    The SEC brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d); 78u-1].

7.    The SEC seeks a final judgment: (a) permanently enjoining Muggleston from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (b) ordering Muggleston to disgorge any ill-gotten gains he received with prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(5) and (7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Muggleston to pay a civil monetary penalty pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

8.    This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d); 78u-1; 78aa(a)]. Muggleston, directly and indirectly, has made use of the means or instrumentalities of interstate commerce, of the mails, or

2

of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

9.      Venue is proper in this District pursuant to Section 27(a) of the Exchange Act [ ]. Defendant Muggleston resides in this District.

## DEFENDANT

10.      **Casey Muggleston**, age 43, resides in Wilmington, Delaware. From at least May 2008 to the fall of 2025, Muggleston worked at Constellation, first as a nuclear engineer and then as an engineering manager in the license renewal group. Constellation's license renewal group is in charge of renewing the licenses of nuclear power plants, including working with the U.S. Nuclear Regulatory Commission.

## RELEVANT ENTITY

11.      **Constellation Energy Corporation** is headquartered in Baltimore, Maryland and is an energy production company. Constellation has been a public company since February 2022, when it was spun off from Exelon Corp., and its securities are listed on the NASDAQ Global Select Market under the ticker symbol "CEG."

## RELEVANT TRADING TERMS

12.      A "call option" is a type of contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying security at a specified price within a specified time. The "strike price" of a call option is the price per share at which the option owner can buy the underlying security if the owner chooses to exercise the option. The "expiration date" of a call option is the last day that an option contract is valid. If the option owner chooses not to exercise the option (in other words, not to buy 100 shares of the underlying stock) and the strike price is above the current stock price at expiration, the option expires and becomes worthless,

and the owner loses the money the owner paid to buy the option. A call option becomes more valuable as the price of the underlying security rises relative to the strike price. Therefore, a buyer of a call option is betting that the price of the underlying security will rise.

13.     If the strike price of a call option is below the price at which the stock is trading, the call option is considered "in-the-money" because the exercise of the option would allow the option owner to make a profit by purchasing the stock at the strike price and selling it for a higher price. If the strike price is above the price at which the stock is trading, the call option is "out-of-the money" because the exercise of the option to purchase the stock at the strike price and immediate sale of the stock at a lower price would result in a trading loss.

14.     A "put option" is a type of contract that gives the owner the right, but not the obligation, to sell 100 shares of the underlying security at a specified price within a specified time. The "strike price" of a put option is the price per share at which the option owner can sell the underlying security if the owner chooses to exercise the option. The "expiration date" of a put option is the last day that an option contract is valid. If the option owner chooses not to exercise the option (in other words, not to sell 100 shares of the underlying stock) and the strike price is below the current stock price at expiration, the option expires and becomes worthless, and the owner loses the money the owner paid to buy the option. A put option becomes more valuable as the price of the underlying security drops relative to the strike price. Therefore, a buyer of a put option is betting that the price of the underlying security will drop.

15.     If the strike price of a put option is above the price at which the stock is trading, the put option is considered "in-the-money" because the exercise of the option would allow the option owner to make a profit by selling the stock at the strike price and buying it for a lower price. If the strike price is below the price at which the stock is trading, the put option is "out-of-

4

the money" because the exercise of the option to sell the stock at the strike price and immediate buy of the stock at a higher price would result in a trading loss.

16.     An investor can also sell short or "write" a call or put option in exchange for a fee or premium.  By selling short, or writing, an option, that investor is hoping or predicting that the option will not be exercised and will ultimately expire out-of-the-money. In that case, the investor would profit by keeping the premium that he or she had received for selling the option without incurring any cost associated with the exercise of the option. Common option strategies can also involve a combination of options positions or "legs," for example, writing one option at a given strike price while simultaneously purchasing a different option on the same underlying stock at a different strike price.

17.     Selling short a put option at a strike price that is higher than the underlying stock's market price (leg one) while simultaneously buying a put option at a strike price that is lower than the underlying stock's market price (leg two) is a bullish position in that the position would be profitable if the stock price rose above the strike price of leg one and would lose money if the stock price dropped. The purchase of the lower strike price put option in leg two serves as a hedge against some, but not all, losses if the stock price were to experience a very large decline. If the price of the underlying stock rises above the strike price of the leg one option before expiration, the investor would profit.  This profit would consist of the premium received from selling short the leg one option minus the lower cost of purchasing the leg two option.

## FACTS

**A.     Constellation's Confidential Project to Evaluate the Restart of Three Mile Island.**

18.     In February 2024, Constellation began initial discussions with Microsoft to explore Microsoft's interest in a long-term contract for nuclear energy. These discussions

progressed over the following months and included numerous meetings between May 2024 and the September 20, 2024 Announcement.

19.    Project Tetris was the internal code name that Constellation assigned to its confidential project to assess the feasibility of restarting Three Mile Island. The code name was used to ensure the confidentiality of the project.

**B.    Muggleston had Access to Material Nonpublic Information About Project Tetris.**

20.    Through his employment at Constellation, Muggleston acquired material nonpublic information about Project Tetris. As detailed below, between at least May 21, 2024 and September 20, 2024, when the Announcement was made, Muggleston acquired material nonpublic information that Constellation was: (1) actively assessing the feasibility of and seriously considering a restart of Three Mile Island; (2) the likelihood of the restart was increasing as time progressed between May and August 2024; and (3) by August 2024, an announcement regarding the restart was likely to occur.

21.    On May 21, 2024, Constellation's Director of License Renewal emailed Muggleston and other Constellation employees about a Project Tetris kickoff meeting scheduled for the following week. The purpose of the meeting was, in part, to assess what a renewal process would entail if Constellation decided to pursue the restart of Three Mile Island. The email contained the subject line "Confidential Project Tetris," and began with a warning for recipients to "[p]lease keep this very confidential." The email concluded with another admonishment to "keep this highly confidential and do NOT discuss with anyone other than those on this email."

22.    The Director of License Renewal involved Muggleston in Project Tetris because Muggleston's input, and the input of at least one employee whom Muggleston supervised, was necessary for evaluating and planning the restart of Three Mile Island.

6

23.     For instance, beginning in mid-April 2024, one of the Constellation employees who reported to Muggleston was asked to work on buried pipe issues relating to Project Tetris. Muggleston was consulted about that employee's work on Project Tetris since Muggleston was that employee's manager.

24.     On May 24, 2024 Muggleston texted his cousin who lives near Three Mile Island, "[s]o it seems like the TMI restart is building steam. I'm trying to think of how to profit off this so started looking for real estate in the area. . . . Let me know if you see anything or have any other ideas how to make some $ off of this. No guarantees this will go through (a lot's riding on some major component inspections) but there's definitely a lot of energy behind it right now with some of the big dog executives camped out at TMI frequently over the past few weeks."

25.     On June 1, 2024, Muggleston texted his cousin the following: "FYI, just heard that the decision on TMI is going to be made by the board during the next board meeting in June. Not sure the exact date but if they decide to move forward with it, then they'd likely announce this publicly pretty quickly after the decision. They'd have to start hiring a bunch of people to work on the restart (I hear their estimating ~$1.4B but not sure what all is included in that price tag - so lots of people including vendors/contractors so no way they can keep it secret)."

26.     On June 4, 2024, the Director of License Renewal sent an email to Muggleston and others with the subject: "Project Tetris (aka TMI)." The email stated: "I have been working on what that looks like for us if Project Tetris is authorized by the board of directors. I will update the team as soon as can [sic] but will have a detailed discussion at our upcoming all hands meeting."

27.     Between June 4 and July 22, 2024, Constellation held internal meetings, meetings with its attorneys, and meetings with Microsoft regarding the potential Power Purchase

Agreement. On July 1, 2024, Constellation's Transaction Leadership Committee approved the Power Purchase Agreement. On July 15, 2024, there was an internal meeting at Constellation to prepare for a presentation about Project Tetris to the Constellation Executive Committee. On July 19, 2024, the Constellation Executive Committee approved the Power Purchase Agreement. On July 24, 2024, the Power Purchase Agreement was finalized, but was awaiting execution. On July 30, 2024, the Constellation Board of Directors delegated approval of the Power Purchase Agreement to the Constellation Chief Executive Officer.

28.     On August 15, 2024, Muggleston exchanged messages with a Constellation co-worker, which demonstrated the co-worker's confidence that Constellation would restart the nuclear reactor at Three Mile Island. The co-worked stated to Muggleston that there was "no 'if' anymore!" regarding Three Mile Island and described the project as "fully loaded," meaning that Constellation was moving forward with its plan to restart the power plant.

29.     Minutes later on August 15, 2024, Muggleston and others received an email from the Director of License Renewal with the subject "Urgent . . . Tetris Meeting," requesting a meeting the following morning.

30.     In the evening of August 15, 2024, Muggleston received a message from his supervisor asking whether he was working the next day because she needed to set up a meeting to discuss "the Tetris org[.]"

31.     Days later, on August 18, 2024, the Director of License Renewal forwarded an email to Muggleston containing a discussion between the Director of License Renewal and a Constellation Senior Vice President. The forwarded email stated that staffing for Project Tetris could proceed "conditionally for internals," but explained that Constellation was "not posting any external until tetris public announcement is made." The Director of License Renewal

8

forwarded this email to Muggleston and other employees on the management team because Muggleston would be involved in hiring additional engineers as Project Tetris moved forward.

32.     On August 19, 2024, Muggleston received an email from his supervisor in which she recommended moving forward with an internal hire to join the license renewal group, "especially with potential staffing needs for Tetris."

33.     On August 20, 2024, Muggleston messaged a Constellation co-worker to say he was going to ask a question about Tetris in a meeting, but "figured it wasn't a good idea." The co-worker replied, "hint hint – it won't be a long wait[.]"

34.     On August 26, 2024, Muggleston, and others, received an email from the Director of License Renewal stating that "if Tetris were to move forward, then [a certain Constellation employee] would like to become the Site lead for the License Renewal for that project."

**C.      <u>Constellation's Code of Conduct and Prohibitions on Insider Trading.</u>**

35.     During the relevant period, Muggleston's employment with Constellation required him to comply with Constellation's Insider Trading Compliance Policy which, among other things, defined material nonpublic information, prohibited insider trading, and prohibited Muggleston from engaging in the purchase or sale of any options on Constellation securities.

36.     During the relevant period, Muggleston's employment with Constellation also subjected him to the Constellation Code of Business Conduct (the "Code") that included a section prohibiting insider trading and describing that employees had a duty to protect confidential information.

37.     The February 1, 2022 version of the Code contained a section on "Avoiding Insider Trading" that stated, "Insider trading is illegal and damages the trust we have with our investors, the government, and the marketplace." The Code further stated, "Insider trading is a crime that is committed when people who have material nonpublic information trade in shares or

9

other securities of a company before the information becomes available to the public. Because of our roles at Constellation, many of us have that kind of 'inside information' – information that is not known to the public that might be important to someone considering buying or selling shares in Constellation."

38.     The February 1, 2022 version of the Code also provided that to avoid insider trading, employees must, among other things: "[n]ever buy, sell, or trade the stock or other securities of Constellation or any other company while [having] inside information"; "[p]revent inside information from being disclosed to people outside Constellation"; and "[n]ever engage in 'short sales' or trading in market options such as puts or calls on Constellation securities."

39.     The February 1, 2022 version of the Code directed employees to the Insider Trading Compliance Policy for additional information.

40.     The July 30, 2024 version of the Code contained a section on "Insider Trading" that said, "You are prohibited from trading securities of a publicly held company, including Constellation, or influencing others (including family members and friends) to trade securities based on material non-public information." The Code warned employees of criminal and civil penalties for engaging in insider trading and advised those with questions to contact the Legal Department.

41.     The July 30, 2024 version of the Code also referred employees to Constellation's Insider Trading Compliance Policy for additional information and instructed them to contact the legal department with any questions about whether a securities sale or purchase was permissible.

42.     On June 15, 2022 and August 26, 2024, Muggleston completed his periodic training on the Code, which was an interactive on-line training module about the Code. The training he completed on August 26, 2024 included a specific section on insider trading and

material nonpublic information. He received a grade of 96% on the August 2024 training. To complete that August 2024 training, Muggleston had to certify that: "I have reviewed the current Constellation Code of Business Conduct (COBC) and confirm that I am in compliance with it."

43.    Constellation's Code was available to employees through the Code training interface, Constellation's public-facing website, and Constellation's intranet. In 2024, Constellation's Insider Trading Compliance Policy was also available on the Constellation intranet.

44.    At all relevant times, Muggleston owed a duty of trust and confidence to Constellation that included a duty not to use Constellation's material nonpublic information in connection with securities trading.

**D.    In Violation of Section 10(b) of the Exchange Act and Rule 10b-5, Muggleston Traded Constellation Securities Based on Material Nonpublic Information in Breach of his Duty to Constellation.**

45.    Muggleston owned a brokerage account (the "Brokerage Account") at a major online brokerage firm. From at least June 2024 through September 2024, Muggleston accessed that Brokerage Account to trade Constellation securities, including call options.

46.    On June 3, 2024, about two weeks after he received the May 21, 2024 email about Project Tetris, Muggleston began to purchase short-term Constellation call options. Between June 3, 2024 and August 9, 2024, Muggleston purchased Constellation call options that expired before September 2024. He either sold these call options at a loss or they expired worthless.

| Chart A: Trading in Call Options Expiring Before September 2024 | | | | |
|---|---|---|---|---|
| Date | Transaction | Option Series Expiration / Strike Price | Quantity | Closing Stock Price on Current Trading Day |
| 6/3/2024 | Buy call | 8/16/24 $230 | 5 | $208.26 |
| 6/3/2024 | Buy call | 7/19/24 $220 | 8 | $208.26 |
| 6/3/2024 | Buy call | 6/21/24 $220 | 10 | $208.26 |
| 6/4/2024 | Buy call | 6/21/24 $220 | 10 | $203.14 |
| 6/4/2024 | Buy call | 7/19/24 $220 | 2 | $203.14 |
| 6/17/2024 | Sell call | 6/21/24 $220 | -20 | $212.02 |
| 6/17/2024 | Buy call | 7/19/24 $240 | 20 | $212.02 |
| 6/21/2024 | Buy call | 8/16/24 $240 | 10 | $218.13 |
| 6/21/2024 | Buy call | 8/16/24 $230 | 5 | $218.13 |
| 6/27/2024 | Buy call | 7/19/24 $220 | 10 | $204.78 |
| 6/28/2024 | Sell call | 7/19/24 $240 | -20 | $200.27 |
| 6/28/2024 | Sell call | 7/19/24 $230 | -10 | $200.27 |
| 6/28/2024 | Buy call | 7/19/24 $210 | 30 | $200.27 |
| 7/16/2024 | Buy call | 7/19/24 $230 | 10 | $204.88 |
| 7/17/2024 | Buy call | 8/16/24 $220 | 20 | $186.67 |
| 8/9/2024 | Buy call | 8/16/24 $200 | 50 | $189.87 |

47.    As part of his bullish trading strategy, Muggleston also bought and sold Constellation put options during this time. On June 28, 2024, Muggleston simultaneously sold short Constellation put options with a strike price of $200 and purchased Constellation put options with a strike price of $150 all with an expiration date of August 16, 2024. Selling the $200 strike price put options would allow Muggleston to profit by collecting a premium at the time of sale, which he would be able to keep as a profit if the price of the stock rose above $200 per share and the options expired worthless. By purchasing the $150 strike price put options, Muggleston mitigated his downside exposure on the $200 strike price options in the event that the price of Constellation stock dropped sharply for unforeseen reasons. He added to these positions on July 17, 2024. On August 16, 2024, Muggleston closed out both sides of this paired

12

position as the options were set to expire that day. He did this by selling his Constellation put options with the $150 strike price and buying to cover his short position in Constellation put options with the $200 strike price that he had previously written. He did not profit from these transactions and the table below illustrates this trading activity.

| Chart B: Trading in Put Options | | | | |
|---|---|---|---|---|
| Date | Transaction | Option Series Expiration / Strike Price | Quantity | Closing Stock Price on Current Trading Day |
| 6/28/2024 | Buy put | 8/16/24 $150 | 20 | $200.27 |
| 6/28/2024 | Sell put | 8/16/24 $200 | -20 | $200.27 |
| 7/17/2024 | Buy put | 8/16/24 $150 | 10 | $186.67 |
| 7/17/2024 | Sell put | 8/16/24 $200 | -10 | $186.67 |
| 8/16/2024 | Sell put | 8/16/24 $150 | -30 | $189.98 |
| 8/16/2024 | Buy put | 8/16/24 $200 | 30 | $189.98 |

48.     On July 17, 2024, Muggleston began purchasing Constellation call options that expired on September 20, 2024, the date of the Announcement. After August 9, 2024, Muggleston exclusively purchased Constellation call options that expired on September 20, 2024.

49.     Also beginning on August 16, 2024, Muggleston bought significantly more Constellation call options expiring on September 20, 2024, than he had purchased in the call options expiring on August 16, 2024. By September 3, 2024 he had purchased 550 call options that expired on September 20, 2024, which was more than six times as many as he had purchased of the August-expiring call options, demonstrating Muggleston's increased confidence that the announcement would happen on or before September 20, 2024. For example, if Muggleston's bet on call option purchases did not succeed (i.e., the market price of Constellation stock did not rise

13

above these call options' strike prices by September 20, 2024), the options would expire

worthless and Muggleston would lose all the money he paid for them, approximately $66,595.

50.    The table below sets forth Muggleston's trading in Constellation call options that

expired on September 20, 2024 and resulted in his illicit profits:

| Chart C: Trading in Call Options Expiring in September 2024 | | | | |
|---|---|---|---|---|
| Date | Transaction | Option Series Expiration / Strike Price | Quantity | Closing Stock Price on Current Trading Day |
| 7/17/2024 | Buy call | 9/20/24 $220 | 10 | $186.67 |
| 8/8/2024 | Buy call | 9/20/24 $210 | 10 | $187.03 |
| 8/14/2024 | Buy call | 9/20/24 $220 | 20 | $186.15 |
| 8/16/2024 | Buy call | 9/20/24 $220 | 50 | $189.98 |
| 8/16/2024 | Buy call | 9/20/24 $230 | 100 | $189.98 |
| 8/19/2024 | Buy call | 9/20/24 $220 | 11 | $192.78 |
| 8/20/2024 | Buy call | 9/20/24 $220 | 19 | $190.72 |
| 8/20/2024 | Buy call | 9/20/24 $210 | 20 | $190.72 |
| 8/20/2024 | Buy call | 9/20/24 $230 | 50 | $190.72 |
| 8/23/2024 | Buy call | 9/20/24 $210 | 20 | $194.99 |
| 8/23/2024 | Buy call | 9/20/24 $220 | 40 | $194.99 |
| 8/29/2024 | Buy call | 9/20/24 $220 | 1 | $194.44 |
| 8/30/2024 | Buy call | 9/20/24 $220 | 49 | $196.70 |
| 8/30/2024 | Buy call | 9/20/24 $230 | 50 | $196.70 |
| 9/3/2024 | Buy call | 9/20/24 $200 | 100 | $177.78 |

14

51.     Muggleston purchased these options while aware and on the basis of material nonpublic information concerning Project Tetris, and in breach of a duty of trust and confidence he owed to Constellation.

52.     On September 20, 2024 at 7:00 a.m. ET, the Announcement was made. Constellation's stock price closed at $254.98 that day, up $46.48 or 22.3% from the $208.50 closing price on September 19, 2024.

53.     On September 20, 2024, after the Announcement, Muggleston sold all his Constellation call options. In so doing, he made approximately $1.4 million.

**E.    Muggleston Acted with Scienter When he Traded Based on Constellation's Material Nonpublic Information.**

54.     At the time of his trading described above, Muggleston knew, consciously avoided knowing, or was reckless in not knowing that the information regarding Project Tetris described above that had been entrusted to him was material and nonpublic.

55.     At the time of the trading described above, Muggleston knew, consciously avoided knowing, or was reckless in not knowing that he owed Constellation a duty to keep confidential any material nonpublic information regarding Project Tetris, and to refrain from using this information to place trades for his own benefit.

56.     Muggleston knowingly or recklessly breached his duty to Constellation by trading in the securities of Constellation while aware and on the basis of material nonpublic information provided to him by Constellation.

**F.**    **Muggleston's Family Members Traded Contemporaneously with Muggleston and Consistent with the Material Nonpublic Information He Possessed.**

57.    Two of Muggleston's close family members, Relative 1 and Relative 2, also purchased Constellation options during the relevant period, though neither of them profited from their trading of Constellation options.

58.    On June 24, 2024, Relative 1 entered an order to purchase two Constellation call options with an expiration date of July 19, 2024 and a strike price of $250. The order did not get executed. On June 27, 2024, Relative 1 entered an order to purchase one Constellation call option with an expiration date of July 19, 2024 and a strike price of $230. That order also went unexecuted. On July 17, 2024, Relative 1 entered an order and purchased two out-of-the-money Constellation call options with an expiration date of August 16, 2024, one with a strike price of $240 and one with a strike price of $250. That same day, Muggleston also purchased short-term, out-of-the-money Constellation call options that expired in August 2024 with a strike price of $220. Relative 1 had not previously purchased Constellation call options.

59.    On August 17, 2024, approximately one month before the Announcement, Muggleston texted Relative 1 a presentation about another publicly traded nuclear energy company that was providing energy to a third party. Muggleston noted that Three Mile Island's capacity was 140 megawatts less than the other company's capacity, but he was "sure [Three Mile Island's] deal will be for the whole amount since they need some guarantees before they'd consider coughing up the ~$1.5B it'd take to restart." Muggleston told Relative 1 that the other publicly traded nuclear energy company's stock "immediately jumped 15% when they announced their deal and almost 30% over the month following the announcement." He added that "Constellation earnings per share is about $8 this year. A deal like this would add about $1 to that and that's just the extr [sic] … Extra $ from the deal[.]"

60.     Later that same day, Muggleston messaged Relative 1: "I don't know if they'll even be successful getting the plant restarted but it doesn't really matter. It will jump when the announcement is made. … If the timing works out, it could really go wild. 230 Sept calls . . . would >15x if it jumped 25% by mid Sept (a little over 52 week high)."

61.     Relative 1's call options ultimately expired worthless on August 16, 2024. On the morning of September 20, 2024, after the Announcement, Relative 1 messaged Muggleston, "Haha I can't believe I forgot to roll them into another month."

62.     On August 20, 2024, Relative 2 purchased Constellation call options with a strike price of $220 and an expiration date of September 20, 2024. The options series that Relative 2 purchased was the same options series as one of the three Constellation options series that Muggleston purchased that same day (expiring September 20, 2024 with a strike price of $220).

63.     On September 3, 2024, Relative 2 again bought a similar series of Constellation call options as Muggleston.

64.     Relative 2 sold the Constellation options he purchased on August 20 and September 3, before the September 20, 2024 Announcement.

**G.     After the Announcement, Muggleston Continued to Express an Interest in Trading Based on Material Nonpublic Information.**

65.     After Muggleston's illegal trading based on his knowledge of Project Tetris, Muggleston continued to express an interest in trading on material nonpublic information in violation of his duty to Constellation.

66.     In 2025, Muggleston exchanged messages with Relative 1 and Relative 2 about other Constellation deals, not involving Project Tetris, that indicate he would have liked to trade on material nonpublic information about those deals.

17

67.    On January 10, 2025, Constellation announced a definitive agreement whereby it would acquire a private energy company, which caused Constellation's stock price to increase. After the announcement, Muggleston texted Relative 2, "[w]hat's kinda messed up/suspicious is that, like the [Three Mile Island] announcement, this also happened on the monthly option expiration date making it very very profitable for anyone with inside info." He then texted Relative 1, "Wtf ... nobody told me about the merger that my company announced today but if you'd known and picked the right call, you could've turned $1000 yesterday into $4.3MM today!"

68.    Similarly, on June 3, 2025, Constellation and Meta announced a 20-year power purchase agreement, which initially caused Constellation's stock price to increase that morning though the price did not stay elevated all day. After that announcement, Muggleston texted Relative 2, "[a]pparently they didn't wait for the license [for the Constellation-owned plant that would supply power to Meta]. That sucks! Constellation is up 12% this morning but [I] missed it." He texted Relative 1, "[w]ell fuck! I was told they weren't going to announce the deal until they got the license … but it came out this morning and [Constellation] jumped 15%. The right calls are up well over 10X but fucking missed it."

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

69.    The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 66, inclusive, as if they were fully set forth herein.

70.    By virtue of the foregoing, Muggleston, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes

or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon persons.

71.     By virtue of the foregoing, Muggleston, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

### I.

Finding that Defendant violated the provisions of the federal securities laws as alleged herein;

### II.

Entering an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Ordering Defendant to disgorge all ill-gotten gains, plus prejudgment interest;

**IV.**

Ordering Defendant to pay a civil penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**V.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.


Dated: June 24, 2026                    Respectfully submitted,


                                        /s/ Sharan E. Lieberman

                                        Sharan E. Lieberman (SL6623)
                                        Securities and Exchange Commission
                                        Denver Regional Office
                                        Byron G. Rogers Federal Building
                                        1961 Stout Street, Suite 1700
                                        Denver, CO 80294-1961
                                        (303) 844-1027
                                        Email:  liebermans@sec.gov

                                        *Attorney for Plaintiff*

21